Argued and submitted September 2, 1987, Court of Appeals affirmed, decision of trial court affirmed in part and reversed in part and remanded for further proceedings January 12, reconsideration denied February 23, 1988

ARENA,
*Respondent on Review,*

*v.*

GINGRICH,
*Petitioner on Review.*

(TC A8306-03487; CA A36593; SC S33932, S33935)

748 P2d 547

Thomas E. Cooney, Portland, appeared on behalf of petitioner on review. With him on the petition for review was Connie K. Elkins, Cooney, Crew & Wihtol, Portland.

David Gernant, Portland, appeared on behalf of respondent on review. With him on the brief were Leo R. Probst and Richard M. Rogers, Leo R. Probst & Associates, Portland.

LINDE, J.

## LINDE, J.

Defendant Gingrich, a surgeon, operated on plaintiff to correct a hiatal hernia. Before doing so, he explained to plaintiff two alternative procedures for repairing such a hernia by wrapping and suturing a portion of the stomach to the esophagus. In fact, however, he eventually employed a third procedure, which entailed implanting in the patient an artificial device known as an Angelchik ring. Plaintiff sued for damages, alleging physiological and psychic injuries and claims for relief separately identified in the complaint as "negligence" and "battery." A jury decided against plaintiff on both claims. On appeal, the Court of Appeals reversed the judgment for defendant on the negligence claim, holding that the circuit court erred in instructing the jury that defendant's failure to obtain plaintiff's consent to the use of the Angelchik ring would not be the "legal cause" of her alleged injuries if a prudent person in plaintiff's position would have consented to that procedure. *Arena v. Gingrich,* 84 Or App 25, 733 P2d 75 (1987). Defendant petitioned for review of that holding and plaintiff for review of the court's ruling on the battery claim. We affirm the decision of the Court of Appeals and remand the case to the circuit court for further proceedings.

Plaintiff alleged three specifications of negligence, the one relevant here being that defendant implanted the Angelchik device "without plaintiff's knowledge or consent, and in violation of ORS 677.097." That statute provides:

"(1) In order to obtain the informed consent of a patient, a physician or podiatrist shall explain the following:

"(a) In general terms the procedure or treatment to be undertaken;

"(b) That there may be alternative procedures or methods of treatment, if any; and

"(c) That there are risks, if any, to the procedure or treatment.

"(2) After giving the explanation specified in subsection (1) of this section, the physician or podiatrist shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician or podiatrist shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so

would be materially detrimental to the patient. In determining that further explanation would be materially detrimental the physician or podiatrist shall give due consideration to the standards of practice of reasonable medical or podiatric practitioners in the same or a similar community under the same or similar circumstances."

ORS 677.097 specifies what a physician must do to obtain "informed consent," a phrase whose use is not itself explained in the statute, but which this court had with some misgivings adopted from other courts in a few cases preceding its enactment. *See Holland v. Srs. of St. Joseph, Seeley,* 270 Or 129, 522 P2d 208, 526 P2d 577 (1974); *Getchell v. Mansfield,* 260 Or 174, 489 P2d 953 (1971); *Mayor v. Dowsett,* 240 Or 196, 400 P2d 234 (1965). Enactment of ORS 677.097 essentially settled the elements of a physician's duty to explain a proposed procedure or treatment to a patient, subject only to the reference to professional standards in the final sentence of the statute. *See Tiedemann v. Radiation Therapy Consultants,* 299 Or 238, 247-48, 701 P2d 440 (1985).

■   Defendant contends that even if he did not meet the duty defined in ORS 677.097, his failure to do so nevertheless was not the cause of plaintiff's injuries if a reasonable patient would have consented to the implant procedure. He asserts that a majority of courts have applied such an "objective test" of causation. The Court of Appeals majority thought that this "objective test" of causation is "anomalous" and "makes no sense," 84 Or App at 30-31. We agree.

When liability for physical injuries is premised on a failure to obtain a patient's consent in the manner prescribed by ORS 677.097, a patient's claim may be that she did not consent at all, or that she consented only because she was not fully informed. The injury must have resulted from the wrongful conduct. The failure properly to obtain the patient's consent "causes" the alleged harm if after a proper explanation the patient would not have consented to the procedure (unless, of course, the harm would have occurred without the procedure). What the patient in fact would have done after a full explanation is a question about that patient's behavior, not about some other "reasonable" patient's, a question of cause and effect that one might ask in contexts unrelated to any legal consequences.

In contrast, what a physician should explain in the course of obtaining a patient's consent to a procedure or treatment is a norm of professional conduct, a duty. Before ORS 677.097 defined the duty in statutory terms, it could be defined by reference to the "objective" standard of a hypothetical reasonable person in the patient's position, at least in negligence cases, unless the physician knew that the actual patient would withhold consent if informed, reasonably or not. *Holland v. Srs. of St. Joseph, Seeley, supra,* 270 Or at 137. If consent followed explanations sufficient for an ordinary reasonable patient, the physician was not negligent in this respect, and no issue of cause would arise. If the explanation would not adequately inform such a patient, the physician might be found negligent, leaving the factual question whether the omission led to the patient's consent. How could that question, the causation issue, reintroduce some hypothetical reasonable patient's reaction to the missing information without simply reopening the already answered negligence issue?

One answer is that opinions using an "objective test" of causation are not speaking of cause but of "proximate cause." *See, e.g., Todd v. United States,* 570 F Supp 670, 678 (D SC 1983); *St. Gemme v. Tomlin,* 118 Ill App 3d 766, 769, 455 NE 2d 294, 296 (1983); *see also* 2 Louisell and Williams, Medical Malpractice § 22.14 (1987). Concurring in this court's first "informed consent" case, Justice O'Connell argued for a clear distinction between the two questions whether defendant's conduct was negligent and whether it caused plaintiff's injury. *Mayor v. Dowsett, supra,* 240 Or at 238-39. Following his lead, *see Dewey v. A.F. Klaveness & Co.,* 233 Or 515, 519-45, 379 P2d 560 (1963)(O'Connell, J., specially concurring), this court long ago disapproved the "proximate cause" formula, which confuses limits on the reach of liability with questions of cause and effect that often are beyond dispute. *See, e.g., Stewart v. Jefferson Plywood Co.,* 255 Or 603, 606 n 1, 469 P2d 783 (1970). Trial court efforts to avoid this confusion are not made easier when parties, like the present plaintiff, nevertheless continue to file pleadings alleging that the other's negligence was the "proximate cause" of plaintiff's condition and that plaintiff incurred injuries as the "proximate result" of defendant's negligence. If omitted information would have led a particular patient to reject treatment for some idiosyncratic and unpredictable reason, this fact may bear on the reasonableness of the omission, but it has no bearing on cause and effect.

The "objective" or "reasonable patient" test of causation, however, was invented and is defended for a purely pragmatic rather than logical reason: the apprehension that juries would hold physicians liable to patients for an undesired outcome when a patient testifies after the fact that she would not have consented to the procedure had she been properly informed. The spread of this view dates from two influential opinions of 1972 in the District of Columbia and in California.

The federal court wrote about "the factual issue of causality" in cases where the patient was not properly informed:

> "It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury. We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him. When, prior to commencement of therapy, the patient is sufficiently informed on risks and he exercises his choice, it may truly be said that he did exactly what he wanted to do. But when causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: 'Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized."

*Canterbury v. Spence,* 464 F2d 772, 790 (DC Cir 1972)(footnotes omitted). The court therefore held it "better" to test causality by what a prudent person in the patient's position would have decided if properly informed. *Id.* at 791. Similarly, the Supreme Court of California wrote:

> "[A] causal connection arises only if it is established that had revelation been made consent to treatment would not have been given. * * *
>
> "The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial

the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils."

*Cobbs v. Grant,* 8 Cal 3d 229, 245, 104 Cal Rptr 505, 502 P2d 1, 11-12 (1972)(citations omitted).

Plainly the "objective test" in these opinions is not a test of causation but a test of proof. It is not the first time that lawyers and judges have bent the question of causation, of how things happened, to concerns of policy. *See* 4 Harper, James and Gray, The Law of Torts, § 20.4, 130-33 (2d ed. 1986)(citing other writings). But we see no need to sacrifice logic. If a jury finds that the omitted information would have been immaterial to a prudent patient's decision, the physician (in a negligence case without ORS 677.097) would not be negligent in omitting it. The statute having defined the standard of disclosure without requiring reference to what a prudent patient reasonably would want to know, we shall not reintroduce that hypothetical prudent patient by the back door of "causation." As for the risk that the patient will be moved by "bitterness or disillusionment" or otherwise to claim that, properly informed, she would have declined what proved to be an unsatisfactory procedure, this possibility doubtless will not be permitted to escape a jury's attention. Factfinders are not bound to take the patient's word on that question but may decide it themselves on the available evidence. The case therefore must be remanded to the circuit court on plaintiff's negligence claim.

■ Plaintiff asserted that the circuit court erred in denying her motion for a new trial on the battery claim because the undisputed evidence allowed no doubt that defendant's substitution of an unexplained procedure was a technical battery, but the Court of Appeals declined to consider this assignment of error because plaintiff had not moved for a directed verdict

(or a peremptory instruction). We agree with the court's result, though not with its citation for it.[1]

The decision of the Court of Appeals is affirmed. The decision of the trial court is affirmed in part and reversed in part. The case is remanded to the circuit court for further proceedings.

---

[1] The court cited *Barrett v. Warrington,* 60 Or App 406, 653 P2d 1020 (1982), which rested on ORCP 64B.(6) and relied on *Maulding v. Clackamas County,* 278 Or 359, 563 P2d 731 (1977), which was based on the predecessor to that rule. The present case involves ORCP 64B.(5), which unlike ORCP 64B.(6) does not state an express requirement of a prior objection or expression. Nevertheless, a motion for a directed verdict has long been a prerequisite for an appeal assigning lack of evidence, with or without a motion for a new trial, *Ruckman v. Ormond,* 42 Or 209, 70 P 707 (1902); *see, e.g., Turman v. Central Billing Bureau,* 279 Or 443, 451, 568 P2d 1382 (1977) (citing cases), *Klemgard v. Wade Seed Co.,* 217 Or 409, 420, 342 P2d 757 (1959), although some opinions have not been consistent. *Compare Burrows v. Nash,* 199 Or 114, 121, 259 P2d 107 (1953), *Lyons v. Browning,* 170 Or 350, 354, 133 P2d 599 (1943). If there still are cases in which denial of a new trial for lack of any evidence to sustain it can be an abuse of discretion without a prior motion for a directed verdict or peremptory instruction, this is not such a case.