Argued and submitted December 2, 1997, amended notice of appeal dismissed, reversed and remanded with instructions on appeal, affirmed on cross-appeal June 10, petition for review allowed December 22, 1998 (328 Or 194)

Danita J. MACY
and Lawrence B. Macy,
*Respondents-Cross-Appellants,*

*v.*

Douglas M. BLATCHFORD, M.D.,
*Appellant-Cross-Respondent,*

*and*

Phillip S. ALBERTS, M.D.,
*Defendant.*

(9407-04746; CA A93045)

961 P2d 873

Renee G. Wenger argued the cause for appellant - cross-respondent. With her on the briefs was Hibbard, Caldwell & Schultz.

Kathryn H. Clarke argued the cause and filed the brief for respondents - cross-appellants.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

**HASELTON, J.**

Defendant Douglas Blatchford, M.D.,[1] appeals from an order and an amended order setting aside a judgment for defendant and granting plaintiffs Danita and Lawrence Macy a new trial in a medical malpractice action. Plaintiffs[2] conditionally cross-appeal from the original judgment, asserting that, in the event we set aside the new trial order as procedurally defective, that judgment must, nevertheless, be reversed because of errors at trial. Plaintiffs contend, particularly, that the trial court erred in barring them from pleading and proving an alleged sexual relationship between defendant and his patient, Ms. Macy. We reverse and remand on the appeal, dismiss the amended notice of appeal, and affirm on the cross-appeal.

The record discloses the following material facts: Plaintiffs are husband and wife. Defendant was plaintiff's gynecologist between May 1982, when she was 15 years old, and September 15, 1992. Beginning in the early 1980s, plaintiff had a history of pelvic pain. Plaintiff visited defendant's office complaining of pelvic pain three times in 1982 and once in 1985. The parties dispute how continuous, severe, or debilitating the pain was, but it is undisputed that, in January 1992, plaintiff again returned to defendant, complaining of severe pelvic pain. On February 4, 1992, plaintiff consulted Dr. Alberts for pelvic pain. Alberts suspected endometriosis, an abnormal growth of uterine tissue outside of the uterus, and recommended laproscopic surgery to confirm the diagnosis. On February 14, 1992, Alberts performed the laproscopy, located and removed an endometrioma from plaintiff's left ovary, and diagnosed "probably endometriosis." Later in February, defendant reviewed Alberts' records and a videotape of the laproscopy and diagnosed active endometriosis.

On May 29, 1992, plaintiff returned to defendant's office complaining of pain in the area of her left ovary. Defendant discussed with her a second laproscopy and possible left salpingo-oophorectomy (removal of the fallopian tube and

---

[1] A second defendant, Phillip Alberts, M.D., was dismissed by stipulation before trial.

[2] All references in this opinion to "plaintiff" in the singular are to Danita Macy.

ovary). The exact sequence is unclear from the record, but at some time before the second laproscopy, plaintiff consulted Dr. Rogers, who discussed with her the salpingo-oophorectomy procedure. On June 3, 1992, defendant performed laproscopy including a salpingo-oophorectomy. According to plaintiff, in February 1992, she and defendant became consensually sexually intimate, a relationship that involved kissing and sexual touching. That relationship continued until July 1992. Defendant denied that a sexual relationship existed.

Before and after the June 1992 surgery, defendant attempted to treat plaintiff's symptoms in a variety of ways, including the use of laser and electrocautery surgery, antibiotics, oral contraceptives, and Depo-provera. Nevertheless, plaintiff continued to experience pelvic pain, and defendant recommended that she undergo a right salpingo-oophorectomy and hysterectomy. On August 20, 1992, defendant performed that surgery.

Thereafter, plaintiff continued to experience pelvic pain, and she later developed left flank and back pain. As the level of that pain increased, testing revealed that plaintiff's left ureter—the tube connecting the kidney to the bladder—had become obstructed. In November 1992, Dr. Ellis surgically repaired plaintiff's ureter. The parties disputed whether staples that defendant had inserted during the June 1992 surgery obstructed the ureter and whether, or to what extent, plaintiff's subsequent symptoms, including her post-hysterectomy symptoms and level of kidney function by November 1992, were related to the stapling. When plaintiff consulted a new gynecologist, Dr. Redwine, in January 1993, she still reported debilitating pelvic pain. Redwine also diagnosed endometriosis and, in February 1993, performed a final surgery to remove suspected endometrioma. As of February 1996, plaintiff reported to Redwine that her pelvic pain had substantially diminished.

In 1994, plaintiffs filed a complaint, alleging that defendant had been negligent in four ways: (1) in stapling the ureter during the June 1992 surgery, thus causing it to become obstructed; (2) in failing to diagnose the stapled ureter as the cause of plaintiff's continuing pain after the June

1992 surgery; (3) in recommending the August 1992 surgery; and (4) in failing to obtain plaintiff's informed consent by advising her of alternatives to the August 1992 surgery.

Shortly before trial, in February 1996, plaintiffs moved to amend the complaint to include a specification of negligence alleging that defendant and plaintiff had a sexual relationship and that defendant was negligent in subsequently continuing the physician-patient relationship. Defendant denied that he had a sexual relationship with plaintiff and opposed the motion. The trial court denied the motion to amend. *See* 154 Or App at 330-31.

Defendant subsequently filed a motion *in limine* to exclude any evidence of a sexual relationship between plaintiff and defendant on the ground that it was irrelevant. OEC 402. Alternatively, defendant argued that such evidence should be excluded because any probative value was substantially outweighed by the danger of unfair prejudice to defendant and of confusion to the jury. OEC 403. Plaintiffs responded that evidence of a sexual relationship was relevant to their allegations that defendant had negligently recommended the August 1992 surgery and that defendant had failed to obtain plaintiff's informed consent. The trial court granted the motion, stating:

> "[E]ither [defendant] malpracticed or he didn't, and I just think that the probative value—obviously, if I were the plaintiff, I would want the information in front of a jury because it's highly inflammatory and prejudicial as it could be.

> "So I'm going to grant the motion *in limine*."

During trial, plaintiffs called Dr. Mazur, an associate professor of medicine at Oregon Health Sciences University, who testified about the standard of care for informed consent. Mazur testified that the standard of care is usually met during a doctor-patient conference during which the "procedure, alternatives, and risks" (PAR) are discussed. Over objection, Mazur was permitted to testify about the meaning of "substantial detail" in ORS 677.097, the informed consent statute,[3] and the range of alternatives that should be covered in a PAR conference.

---

[3] ORS 677.097 is set forth below. 154 Or App at 327-28.

In accordance with the court's *in limine* ruling, plaintiffs then elicited from Mazur, as an offer of proof, the testimony he would have given regarding the professional implications of the alleged sexual relationship. During the offer of proof, Mazur testified that: (1) there is a standard of care within the medical community that strictly prohibits sexual relationships between physicians and patients; (2) if a physician and patient became sexually involved, the standard of care requires referring the patient to another doctor for treatment; (3) when physicians and patients become sexually involved, the physician's objectivity is presumptively affected and, hence, a conflict is assumed to develop between the patient's treatment needs and the physician's interests;[4] and (4) a physician who is sexually involved with a patient is considered to be incapable of obtaining informed consent from that patient. Mazur explained:

"A.   [T]he whole nature of patient/physician decision-making is based on an objective view and discussion of alternatives—of risks, alternatives, and benefits. Once there's an emotionally charged relationship that's interfering with a physician/patient relationship, the physician's decision-making capacities have to be called into question.

"Therefore, anything related to risks and benefits like informed consent would also be called into question because the physician is the decision-maker, because they're not— quite frankly the patient's best interest is not at the forefront any more.

"Q.   [by plaintiff's counsel] In addition to it being presumed that the physician is not making an objective judgment, is there a concern that the physician may not be making objective decisions?

"A.   Yes, that's correct."

Finally, Mazur testified that a sexual relationship renders the patient incapable of giving adequate informed consent.

---

[4] Mazur stated:

"Once you have issues that are emotionally charged in any way, the physician's objective relationship to the patient stops and essentially cannot function as a physician with good conscience."

In addition to Mazur's putative testimony, plaintiffs offered a 1991 report from the Council on Ethical and Judicial Affairs of the American Medical Association, entitled "Sexual Misconduct in the Practice of Medicine." They also proffered an excerpt from plaintiff's deposition, in which she testified that she and defendant had engaged in kissing and touching during office visits and about the effect she believed that personal relationship had on her professional relationship with defendant. On cross-examination during her deposition, plaintiff was asked whether her alleged relationship with defendant prevented her from fully understanding the alternatives and risks of the August 1992 surgery or prevented her from fully understanding and giving her informed consent, and she responded, "I don't know." When asked whether she would have consented to the August 1992 surgery if she had not been physically involved with defendant, plaintiff responded, "I do not know whether I would have or not."

Plaintiffs then asked the court to reconsider its *in limine* ruling. The court ultimately declined to do so. During closing arguments, defendant's attorney called into question why plaintiff would have agreed to the August 1992 surgery:

"And the last thing that has to be explained is why? Why would a patient agree to the surgery that [plaintiff] agreed to? You know, if you think about your own experience or people you know and their attitude towards major surgery, it's not a pleasant prospect. It's not something that most people look forward to and most people seek out, so why would she be agreeing to this surgery?

"Let me suggest a couple of reasons. Maybe it has something to do with the degree of symptoms she's experiencing * * * or maybe as plaintiff says she just simply didn't understand what the disease was that she had.

"* * * * *

"[L]ook at what the plaintiff is asking you or is telling you about [informed consent]. Remember in your experience what would people—what would cause people to agree to surgery of this magnitude?

"There are symptoms, which is * * * what [defendant] said was causing her to agree to use surgery, or a combination of fear and lack of knowledge, which is what plaintiff is saying caused her to agree to this surgery[.]"

Plaintiffs' counsel did not object to those remarks. However, after the jury had retired to deliberate, the trial court *sua sponte* commented on defense counsel's arguments:

"As we started this trial, kind of late in the game, the court was faced with the issue of the relationship between the plaintiff and the defendant and came to the conclusion it was a very close call as to which way we should go on it.

"Certainly it was prejudicial * * * evidence concerning the defendant and maybe prejudicial to the plaintiff also.

"* * * * *

"I was concerned with and made very clear that counsel never ask the plaintiff any questions when she testified, but on two occasions in her closing argument the defense raised the issue why she would agree with these surgeries without question; and another question, again the reason was just fear and a lack of knowledge.

"Well, I kind of felt like I had been unfair to the plaintiff, because she might very well have said there was another reason; and you may have opened the door on that problem for yourself.

"* * * * *

"The court's noted that, so the court is going to give consideration to any motions for a new trial filed and also to * * * court action on its own initiative, pursuant to [ORCP] 64 G."

The jury subsequently returned a defense verdict. In reaching that verdict, the jury rendered the following responses to special interrogatories:

"1. Did the defendant Blatchford negligently fail to discover and diagnose the injury to plaintiff Ms. Macy's left ureter within a reasonable time after it had been stapled and obstructed, and before he recommended further surgery to remove her uterus and remaining ovary which caused damage to Ms. Macy?

"ANSWER: ___ Yes   _X_ No.

"* * * * *

"2.   Did the Defendant Blatchford act negligently by recommending surgical removal of Plaintiff Ms. Macy's uterus and remaining ovary for treatment of pain without adequately exploring the causes of her pain and the medical and conservative surgical treatment options that were available causing damage to Ms. Macy?

"ANSWER: ___ Yes   _X_ No.

"* * * * *

"3.   Was the Defendant Blatchford negligent by failing to obtain Plaintiff Ms. Macy's informed consent to surgical removal of her uterus and right ovary causing damage to Ms. Macy?

"ANSWER: ___ Yes   _X_ No"[5]

On March 15, 1996, the court entered a judgment for defendant.

Plaintiffs timely moved for a new trial, relying on ORCP 64 B(6).[6] Plaintiffs contended that the exclusion of evidence of sexual contact between plaintiff and defendant was error because that evidence was relevant to defendant's alleged negligence in failing to obtain plaintiff's informed consent for the August 1992 surgery. Plaintiffs also referred to the court's comments after defendant's closing argument and asserted that defense counsel's remarks necessitated a new trial. Defendant opposed the motion, disputing any

---

[5] The jury also rendered a special interrogatory explicitly finding that defendant did not negligently staple and obstruct plaintiff's left ureter during the June 1992 surgery.

[6] ORCP 64 B(6) provides:

"**B  Jury trial; grounds for new trial.** A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B(6)  Error in law occurring at the trial and objected to or excepted to by the party making the application."

impropriety in closing argument, reiterating that the evidence was irrelevant and prejudicial, and arguing that plaintiffs' offer of proof was insufficient. In a reply memorandum, plaintiffs also invoked ORCP 64 G[7] as an alternative basis for a new trial, given the trial court's remarks following defendant's closing argument. Plaintiffs requested that the court grant a new trial on all claims or, at least, on the informed consent claim, under Rule 64 G.

The trial court held a hearing on the motion for a new trial on Monday, April 15, 1996, 31 days after the entry of judgment. At the end of the hearing the court stated:

> "[T]he court on the [ORCP] 64 G motion is satisfied that after hearing the offer of proof and after the testimony that having that kind of relationship fell below the standard of care in the community by a physician, and that further that having that type of relationship between a patient and a physician that is the professional there cannot be informed consent, that the court in continuing to allow the motion *in limine* committed error. That was an error that became highly prejudicial to the plaintiff in light of comments of counsel in closing argument as to * * * why she would do this. So the court feels that that error was substantial and compelling and prejudicial, and on that basis the court orders a new trial.
>
> "On the [ORCP 64 B motion], I'm going to give counsel benefit of the doubt and deny the motion on the court's own motion."

On April 30, 1996, 46 days after the entry of judgment, the order granting a new trial under ORCP 64 G "nunc pro tunc to April 23,"[8] but denying plaintiffs' motion based on ORCP 64 B(6), was entered.

---

[7] ORCP 64 G provides:

"**G New trial on court's own initiative.** If a new trial is granted by the court on its own initiative, the order shall so state and shall be made within 30 days after the entry of the judgment. Such order shall contain a statement setting forth fully the grounds upon which the order was made, which statement shall be a part of the record in the case."

[8] The record does not disclose why the trial court referred to April 23—the 39th day after the entry of judgment—rather than April 15, the first court day after Sunday, April 14, the 30th day. See ORCP 64 G (order granting new trial on court's own initiative "shall be made within 30 days after the entry of the judgment"). In all events, as described below, the use of "*nunc pro tunc*" language was ineffective in this context. *See* 154 Or App at 324 n 9.

On May 3, 1996, plaintiffs' counsel submitted a proposed amended order granting a new trial. The proposed order was identical to the order entered on April 30, except that it specified that the allowance of the order granting a new trial under ORCP 64 G was *nunc pro tunc* to April 15.

On May 6, 1996, in response to plaintiffs' May 3 submission, the trial court signed an amended order granting a new trial. That order differed from plaintiffs' proposed May 3 order in that it not only purported to grant a new trial under ORCP 64 G *nunc pro tunc* to April 15, but also allowed plaintiffs' motion for a new trial under ORCP 64 B. The amended order was filed on May 6 but was not entered until May 7.

Also on May 6, 1996, defendant filed a notice of appeal of the April 30 order granting new trial. The notice of appeal, which was mailed by certified mail, was received by the Court of Appeals on May 8, 1996. The record does not disclose whether defendant filed the May 6 notice of appeal before or after the trial court ruled on and signed the amended order allowing new trial.

On May 15, 1996, defendant filed an amended notice of appeal of the May 7 amended order granting new trial. On May 23, 1996, plaintiffs filed a notice of cross-appeal of the original March 15 judgment.

Before addressing the substantive issues that are essential to the appeal and cross-appeal—the admissibility of evidence pertaining to the alleged sexual relationship between defendant and plaintiff and the legal significance of that relationship—we must address a tangle of jurisdictional and procedural issues generated, not surprisingly, by the flurry of post-judgment activities just described. We begin with defendant's appeal of the April 30 order denying plaintiffs' motion for a new trial but granting a new trial on the court's own initiative under ORCP 64 G.

■■ The April 30 order was an appealable order. ORS 19.205(1)(d). Defendant argues, however, that that order was erroneous because, under ORCP 64 G, the court lacked authority to grant a new trial on its own initiative more than 30 days after the entry of judgment. That is correct. *See Maulding v. Clackamas County,* 278 Or 359, 366, 563 P2d

731 (1977); *State ex rel Schrunk v. Johnson*, 97 Or App 420, 776 P2d 863, *rev den* 308 Or 382 (1989).[9] Accordingly, the April 30 order must be reversed.

■     We further conclude that we lack jurisdiction to consider defendant's amended appeal from the amended new trial order entered May 7. In particular, we conclude that, regardless of whether defendant filed his notice of appeal from the original new trial order before or after the trial court *signed and filed* the amended order, it is beyond dispute that the notice of appeal was *filed* (on May 6[10]) before the amended order was *entered* (on May 7). The filing of the notice of appeal divested the trial court of jurisdiction to enter the amended order. *See Johnstone and Johnstone*, 152 Or App 801, 804, 955 P2d 762 (1998); *Alternative Realty v. Michaels*, 90 Or App 280, 287, 753 P2d 419 (1988). Consequently, that order never became final and, hence, appealable. *See* ORS 3.070 ("If signed other than in open court, all * * * orders * * * shall become effective from the date of entry in the register."). *See also Conley and Conley*, 97 Or App 134, 137, 776 P2d 860 (1989) (motion for new trial is "determined" for purposes of ORCP 64 F upon entry in the register). Thus, we lack jurisdiction to consider—and, hence, dismiss—the amended appeal from the amended new trial order.

We turn to plaintiffs' cross-appeal of the original judgment in defendant's favor. The cross-appeal is unusual in that the substantive issues it presents are, in many ways, the obverse of those presented by the appeal. That is, although defendant's "merits" argument on the appeal was

---

[9] The use of *"nunc pro tunc"* language could not retroactively "save" the court's untimely order. *See, e.g., Mangus v. Progress Quarries*, 290 Or 377, 622 P2d 319 (1981); *State ex rel Schrunk v. Johnson*, 97 Or App 420, 776 P2d 863, *rev den* 308 Or 382 (1989). We reiterate that parties rely on purported *"nunc pro tunc"* dispositions at their peril. *See generally Gillespie v. Kononen*, 310 Or 272, 276 n 7, 797 P2d 361 (1990).

[10] Defendant filed his notice of appeal by certified mail and provided proof of that mailing to the clerk of the court. Accordingly, the notice was filed concurrently with the mailing, conferring jurisdiction on this court. *See* ORS 19.270(1) (Court of Appeals "has jurisdiction * * * when the notice of appeal has been served and filed"); ORS 19.260(1) ("The date of filing such notice shall be the date of mailing, provided it is mailed by registered or certified mail and the party filing the notice has proof from the post office of such mailing date.").

that the exclusion of evidence pertaining to the alleged sexual relationship between defendant and plaintiff was not erroneous and did not warrant the allowance of a new trial, plaintiffs' argument on cross-appeal is, at least in part, that the exclusion of that evidence was erroneous and was so prejudicial as to require reversal of the judgment and remand for a retrial. Moreover, the cross-appeal is a "conditional" cross-appeal—plaintiffs specify that we should consider the cross-appeal only "in the event that this court concludes that there was a procedural flaw in the trial court's new trial ruling which mandates reversal." We have so concluded and, thus, reach the cross-appeal.

■     The cross-appeal is properly before us in that it was filed within ten days after the expiration of the 30-day period allowed for filing an appeal from the trial court's original order allowing a new trial. ORS 19.255 provides, in part:

"(2)   Where any party has served and filed a motion for a new trial * * *, the notice of appeal of any party shall be served and filed within 30 days after the earlier of the following dates:

"(a)   The date that the order disposing of the motion is entered in the register.

"(b)   The date on which the motion is deemed denied, as provided in ORCP 63 D or 64 F.

"(3)   Any other party who has appeared in the action, suit or proceeding, desiring to appeal against the appellant or any other party to the action, suit or proceeding, may serve and file notice of appeal within 10 days after the expiration of the time allowed by subsections (1) and (2) of this section."

Here, the order disposing of the motion for new trial was entered on April 30, 1996. "The expiration of the time" to file a notice of appeal from that order—30 days after its entry— was May 30, 1996, and plaintiffs had 10 days from that date, or until June 10, 1996, in which to file a cross-appeal.[11] The cross-appeal was filed on May 23, 1996.

---

[11] Ten days after May 30, 1996, was June 9, 1996, a Sunday. Therefore, the last day is extended to the following Monday. *See* ORS 174.120; ORS 187.010(1)(a).

Plaintiffs raise two related assignments of error on cross-appeal: (1) The court erred in excluding evidence pertaining to the alleged sexual relationship between defendant and plaintiff. (2) The trial court erred in denying plaintiffs' pretrial motion to amend their complaint to add a specification of negligence alleging that defendant breached the standard of care by continuing to treat plaintiff after the alleged sexual relationship began.

■    With respect to the first assignment of error, plaintiffs first contend that the evidence pertaining to the alleged relationship was relevant to their third specification of negligence—*viz.*, that defendant negligently recommended the August 20, 1992, surgery "without adequately explaining the cause of [plaintiff's] pain and the medical and conservative surgical treatment options which were available." Plaintiffs argue, particularly, that evidence of the alleged relationship was probative of whether defendant may have been so distracted that he could not properly exercise professional judgment: "Common sense says that an emotional and/or sexual involvement with a patient can affect a physician's professional judgment: it is a distraction, it can prevent objectivity, it can taint a subjective impression."

Defendant responds that, in malpractice, the standard of care is an objective standard and, thus, evidence of the subjective state of mind of a particular defendant is irrelevant. That is, the only evidence relevant to the third specification of negligence was whether defendant reasonably determined that the August 1992 surgery was indicated.

As noted, the trial court, in granting defendant's *in limine* motion, observed: "Either he malpracticed or he didn't." Implicit in that comment is an acceptance of defendant's relevance (or nonrelevance) argument, at least with respect to the third specification. We agree with that analysis. The question presented by the third specification was whether defendant's recommendation of the August 1992 surgery was *objectively* reasonable given the totality of plaintiff's medical circumstances. Expert witnesses offered conflicting views on that question, and the jury ultimately resolved that conflict in defendant's favor. Factors bearing on defendant's subjective state of mind were irrelevant to that

objective inquiry. *See* OEC 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable * * *") (emphasis supplied).[12]

■     Plaintiffs next argue that evidence of the alleged relationship was relevant to the fourth specification of negligence, which alleged a lack of informed consent. In particular, plaintiffs now contend that the evidence was relevant for either of two reasons: (1) The evidence pertained to credibility and particularly to whether defendant did, in fact, communicate necessary information to plaintiff. Plaintiff testified that such information was not communicated, and defendant testified that it was. Plaintiffs assert that a reasonable juror could conclude that defendant was so "distracted" by the alleged relationship that he inadvertently failed to give the necessary advice, even if he believed that he had done so. (2) A reasonable juror could conclude that, because of the alleged relationship, "plaintiff would not question her doctor's recommendations, that she would place complete trust in him," and, thus, would not seek additional information or advice.

        In evaluating those arguments, it is essential to consider both the language of the informed consent statute, ORS 677.097, and the particular allegations of plaintiffs' informed consent specifications. ORS 677.097 provides, in part:

    "(1)   In order to obtain the informed consent of a patient, a physician * * * shall explain the following:

    "(a)   In general terms the procedure or treatment to be undertaken;

    "(b)   That there may be alternative procedures or methods of treatment, if any; and

    "(c)   That there are risks, if any, to the procedure or treatment.

_____

[12] Because we conclude that the evidence was irrelevant to the third specification of negligence, we do not reach the trial court's alternative determination that, in all events, the prejudicial impact of the evidence would substantially outweigh its probative value, at least as to that specification. That determination pursuant to OEC 403 would, of course, be reversible only if it represented an abuse of discretion. *See, e.g., Carter v. Moberly*, 263 Or 193, 200-03, 501 P2d 1276 (1972).

"(2)  After giving the explanation specified in subsection (1) of this section, the physician * * * shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician * * * shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient."

At the first level, the statute requires that a physician give the information set forth in ORS 677.097(1) and ask the patient if she wants a more detailed explanation. *See Zacher v. Petty,* 312 Or 590, 593-94, 826 P2d 619 (1992). So long as the physician asks if the patient wants a more detailed explanation, compliance with ORS 677.097(1) requires only minimal advice. *See id.* at 594. However, if the physician does not ask if the patient wishes a more detailed explanation, the physician is held to the higher level of disclosure set forth in the last sentence of ORS 677.097(2), which codifies the disclosure required by Oregon common law. *See id.*

The specific language of plaintiffs' informed consent specification is critical because it necessarily frames the relevance inquiry. Plaintiffs alleged that defendant was negligent

"[i]n failing to obtain Plaintiff Danita Macy's informed consent to surgical removal of her uterus and right ovary, in that Defendant Dr. Blatchford did not advise her that there were medical and conservative surgical treatment options available as alternatives to sterilization and menopause, and he did not ask if she wanted detailed information about each of these alternatives."

Thus, the specification is phrased entirely in terms of what defendant told, or did not tell, asked, or did not ask, plaintiff. It does not speak in terms of plaintiff's *receipt* of that information and, particularly, whether, even if the requisite information was communicated, the parties' alleged relationship precluded her from requesting additional information, much less from reasonably assessing the information.

We return to plaintiffs' particular arguments about why the evidence pertaining to the alleged relationship was relevant to the informed consent specification. Whatever the abstract merits of plaintiffs' first, "credibility" argument, it

was not made to the trial court either at the time the court granted the *in limine* motion or when it reiterated its ruling after plaintiffs' offer of proof. Accordingly, we do not consider it. *See State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988); *State v. Riggs*, 143 Or App 427, 430-31, 923 P2d 683 (1996), *rev den* 325 Or 247 (1997).

Our inquiry thus narrows to plaintiffs' second argument, which plaintiffs' counsel cogently summarized in the hearing on the *in limine* motion:

> "It goes to her state of mind in consenting to those surgeries, it goes to her state of mind as to whether she wanted more information or would trust the doctor, it goes to her state of mind as to whether she would seek a second opinion * * *."

The difficulty with that argument is that plaintiff's state of mind—her subjective willingness to seek additional information—is irrelevant to her informed consent claim, as that claim is pleaded. As noted, plaintiffs' informed consent specification focuses solely on defendant's conduct, particularly whether defendant told plaintiff that "there were medical and conservative surgical treatment options available as alternatives to sterilization and menopause, and [that] he did not ask if she wanted detailed information about each of these alternatives." Thus, even assuming that evidence pertaining to the alleged relationship might bear on plaintiff's state of mind, her state of mind was irrelevant to the informed consent specification. The trial court did not err in allowing defendant's *in limine* motion and in subsequently adhering to that ruling. *Cf. Arena v. Gingrich*, 305 Or 1, 6-7, 748 P2d 547 (1988) (a patient's subjective state of mind is relevant where issue is whether, assuming proper disclosure by the physician, particular patient would have consented).

■ Plaintiffs' second assignment of error on cross-appeal is that the trial court erred in denying their pretrial motion to amend to allege, as a separate specification of negligence, that "defendant was negligent in continuing a physician-patient relationship with Plaintiff Danita Macy after February 15, 1992, when he entered into a personal and non-physician relationship with her."

Plaintiffs sought the same damages for that specification of negligence as for the others. That is, they did not allege that plaintiff had suffered any distinct emotional/non-economic damages arising exclusively from the relationship, as opposed to the alleged lack of informed consent and negligent recommendation and performance of the surgery.

Plaintiffs' counsel argued that the proposed amendment alleged an independently actionable specification of negligence:

"You know, what our consultants will say is that how it all develops is he should have terminated the physician/patient relationship immediately once that had occurred.

"Then the inference is that she would have gone to another doctor who would have met the standard of care in terms of recommendations for surgery based on the condition that was presented, and therefore, the damage would have been averted.

"* * * * *

"I think what's new here is our consultants have advised us that it's negligence in and of itself to have continued the relationship because had the relationship been terminated then the surgeries would not have occurred, the advice would not have been given, and the damage would have been prevented."

Defendant opposed the motion, raising three arguments: (1) the proposed allegation failed to state a claim; (2) the proposed allegation was barred by the statute of limitations; and (3) the proposed allegation would "unfairly prejudice" defendant.

During oral argument on the motion, the following colloquy occurred between the court and plaintiffs' counsel:

"THE COURT: Let me ask you this: You know, I've had this issue many times on these series of cases. Let's for the purpose of argument admit that the Doctor unethically engaged in a sexual relationship with a patient, and let's for the sake of argument assume that the surgeries that were performed were performed in a highly competent and efficient manner. Would you have a cause of action?

"[Plaintiffs' counsel]: No.

"THE COURT: Okay.

"[Plaintiffs' counsel]:   At least not in this case.

"THE COURT:   So the gravamen was really was the surgery good or bad?

"[Plaintiffs' counsel]:   The gravamen was that the surgery was not properly indicated. It was recommended by the Doctor when the indications for surgery were not there."

The trial court ultimately denied the motion to amend but did not state the basis for its denial.

On cross-appeal, plaintiffs reiterate that the gravamen of the disputed specification was that "if Dr. Blatchford had terminated his involvement in Mrs. Macy's care, surgery would never have been recommended and performed, and plaintiffs' damages would have been avoided." The fatal defect in plaintiffs' position, however, is that, regardless of the abstract viability of the disputed specification, the jury ultimately rejected the indispensable predicate for any recovery on that specification. To prevail on that specification, plaintiffs had to prove that, but for the alleged relationship, the surgery would never have been recommended and performed. However, the jury rendered a special finding that defendant acted in accordance with the standard of care in recommending the August 1992 surgery. *See* 154 Or App at 320-21 (quoting finding). That is, the jury found that an objectively reasonable physician would have recommended and performed the surgery. Given that finding, even if we were to assume that the disputed specification was legally sufficient, any error in denying the motion to amend did not actually prejudice plaintiffs.

Amended notice of appeal dismissed; on appeal, reversed and remanded with instructions to reinstate judgment; affirmed on cross-appeal.